IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

MILDRED WILLIAMS, )
)
)
      Plaintiff, ) NO. _____
)
v. ) Demand for Jury Trial
)
PEANUT CORPORATION OF )
AMERICA, a Georgia corporation; and )
KELLOG COMPANY, a Delaware corporation, )
)
      Defendants. )
_____)

## COMPLAINT FOR DAMAGES

COMES NOW the plaintiff, by and through her attorneys of record, FLYNN PEELER & PHILLIPS, L.L.C., and William D. Marler, Marler Clark, L.L.P., P.S., and alleges as follows:

### I. PARTIES

1. The plaintiff is a resident of North Easton, Plymouth County, Massachusetts.

2. The defendant, PEANUT CORPORATION OF AMERICA (PCA), is a Georgia corporation, organized under the laws of the state of Georgia, authorized to do business in the state of Georgia, with its principal office located at 2121 Wiggington Road, Lynchburg, Virginia, 24502. At all times relevant hereto, PCA was a manufacturer and seller of various peanut butter products, which it knowingly sold to manufacturers and distributors of its products for use and sale nationwide.

3. The defendant, KELLOGG COMPANY (KELLOGG), is a Delaware corporation, organized under the laws of the state of Delaware with its principal office located in Michigan, at One Kellogg Square, Battle Creek, Michigan, 49016. The defendant Kellogg is therefore a

foreign corporation and not a resident of the state of Georgia. The defendant Kellogg is authorized to and does conduct business in the state of Georgia. At all times relevant hereto, Kellogg was a manufacturer and seller of various peanut butter-containing products.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the defendants have certain minimum contacts with the State of Georgia such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

5. Venue in the United States District Court for the Middle District of Georgia is proper pursuant to 28 USC § 1391(a)(2) because a substantial part of the events or omissions giving rise to the plaintiff' claims and causes of action occurred in this judicial district—i.e., the FDA has identified the likely source of contamination for the nationwide peanut butter *Salmonella* outbreak as the defendant PCA's Blakely, Georgia processing plant. Additionally, the defendants were subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## III. GENERAL ALLEGATIONS

### *Salmonella*

6. *Salmonella* is an enteric bacterium, which means that it lives in the intestinal tracts of humans and other animals, including birds. *Salmonella* bacteria are usually transmitted to humans by eating foods contaminated with animal feces. Contaminated foods usually look and smell normal. Contaminated foods are often of animal origin, such as beef, poultry, milk, or eggs, but all foods, including vegetables, may become contaminated. Many raw foods of animal

origin are frequently contaminated, but fortunately thorough cooking kills *Salmonella*. A food handler who neglects to wash his or her hands with soap and warm water after using the bathroom may also contaminate food.

7. Once in the lumen of the small intestine, the bacteria penetrate the epithelium, multiply, and enter the blood within 24 to 72 hours. As few as 15-20 cells of *Salmonella* bacteria can cause salmonellosis or a more serious typhoid-like fever. Variables such as the health and age of the host and virulence differences among the serotypes affect the nature of the diagnosis. Infants, elderly, hospitalized, and the immune suppressed are the populations that are the most susceptible to disease and suffer the most severe symptoms.

8. The acute symptoms of *Salmonella* gastroenteritis include the sudden onset of nausea, abdominal cramping, and bloody diarrhea with mucous. There is no real cure for *Salmonella* infection, except treatment of the symptoms.

9. Persons with severe diarrhea may require rehydration, often with intravenous fluids. *Salmonella* can be treated with ampicillin, gentamicin, trimethoprim/sulfamethoxazole, or ciprofloxacin. Unfortunately, some *Salmonella* bacteria have become resistant to antibiotics, largely as a result of the use of antibiotics to promote the growth of feed animals.

10. Persons with diarrhea usually recover completely, although it may be several months before their bowel habits are entirely normal. A small number of persons who are infected with *Salmonella* will go on to develop pains in their joints, irritation of the eyes, and painful urination. This is called Reiter's syndrome. It can last for months or years, and can lead to chronic arthritis, which is difficult to treat. Antibiotic treatment does not make a difference in whether or not the person later develops arthritis.

## Past Peanut Butter Outbreaks

11. The first documented outbreak, in 1996, of salmonellosis associated with the consumption of peanut butter was reported in the Journal of Applied Microbiology in 2000. Between April and June 1996, 15 persons with *Salmonella* enterica serovar Mbandaka infection were reported in South Australia. *Salmonella* Mbandaka was isolated from three opened jars of peanut butter from case households, and from three unopened jars from retail outlets. Further investigation implicated roasted peanuts from a third Australian state as the source of the *Salmonella* contamination

12. On February 14, 2007 the United States Food and Drug Administration (FDA), as part of its investigation of a nationwide *Salmonella* outbreak, warned consumers not to eat Peter Pan and Great Value brands of peanut butter with a product code beginning 2111, and announced a recall of the products by their manufacturer, ConAgra. The CDC ultimately linked 628 persons infected from 44 states with the outbreak strain of *Salmonella* Tennessee to the consumption of the product.

## PCA Peanut Butter Outbreak

13. On January 9, 2009, the Minnesota Department of Agriculture (MDA) announced a product advisory after MDA's preliminary laboratory testing indicated the presence of *Salmonella* bacteria in a 5-pound container of King Nut brand creamy peanut butter manufactured by defendant PCA. The contamination was discovered as a result of product testing initiated after an MDH epidemiological investigation implicated King Nut creamy peanut butter as a likely source of *Salmonella* infections in Minnesota residents. The Minnesota cases had the same genetic fingerprint as the cases in the national outbreak.

14. On January 10, 2009, King Nut announced that *Salmonella* has been found in a five pound tub of its peanut butter and that they were voluntarily recalling all of their peanut butter products manufactured by PCA.

15. On January 13, 2009, PCA announced a voluntary recall of peanut butter produced in its processing facility located in Blakely, Georgia because it has the potential to be contaminated with *Salmonella*. The FDA subsequently notified PCA that product samples originating from its Blakely, Georgia, processing plant were tested and found positive for *Salmonella* by laboratories in the states of Minnesota, Georgia, and Connecticut.

16. On January 14, 2009, Kellogg Company announced a product hold on Austin® and Keebler® branded Toasted Peanut Butter Sandwich Crackers, Peanut Butter and Jelly Sandwich Crackers, Cheese and Peanut Butter Sandwich Crackers, and Peanut Butter-Chocolate Sandwich Crackers because PCA is one of several peanut paste suppliers that the company used in its Austin® and Keebler® branded peanut butter sandwich crackers.

17. On January 16, 2009, PCA expanded its voluntary recall to include all peanut butter produced on or after August 8, 2008, and all peanut paste produced on or after September 26, 2008, in its Blakely, Georgia, plant because of potential *Salmonella* contamination. That same day, the Connecticut Department of Health confirmed it found *Salmonella* in an unopened jar of King Nut brand peanut butter manufactured by PCA at its Blakely, Georgia, processing plant.

18. Also on January 16, 2009, Kellogg Company announced a voluntary recall of certain Austin® and Keebler® branded Peanut Butter Sandwich Crackers and select snack-size packs of Famous Amos® Peanut Butter Cookies and Keebler® Soft Batch Homestyle Peanut Butter Cookies because the products have the potential to be contaminated with *Salmonella*.

19. On January 17, 2009, the FDA made an announcement to the public to avoid eating ALL peanut butter-containing products.

20. On January 19, 2009, Kellogg announces that FDA tests revealed that some of its cracker products are contaminated with *Salmonella*.

21. As of January 27, 2009, the Centers for Disease Control (CDC) counts 501 persons from 43 states infected with the same genetic outbreak strain of *Salmonella* Typhimurium, and at least eight deaths.

22. During investigation of the outbreak health officials learned of a number of serious deficiencies at the PCA plant with regard to food safety and quality. On 12 different occasions, peanut products were tested by PCA at the plant and found to be positive for *Salmonella*. These tests included at least one positive result in peanut paste for *Salmonella* Typhimurium. PCA did not notify health officials. Rather, PCA re-tested the paste, obtained a negative result and shipped the product into interstate commerce. In each of the other 11 instances in which product tested positive for Salmonella, PCA re-tested the product, obtained a negative result, and shipped the product into interstate commerce.

23. Health officials found numerous other deficiencies as well. These included:

- A failure to clean the peanut paste line after the *Salmonella* Typhimurium was identified in the paste.
- A failure to establish the effectiveness of the firm's roasting process as an effective kill-step for pathogenic bacteria.
- A failure to store finished food under conditions that would protect against microbial contamination. This included pallets of finished product stored within 3 feet of an area that swabbed positive for *Salmonella* Mbandaka.

- Failure to store finished food under conditions that would protect against microbial contamination.

- The plant was not constructed in such a manner as to allow ceilings to be kept in good repair.

- The design of equipment and utensils fails to preclude the adulteration of food with contaminants.

- Proper precautions to protect food and food-contact surfaces from contamination with microorganisms could not be taken because of deficiencies in plant construction and design.

- Devices and fixtures were not designed and constructed to protect against recontamination of clean, sanitized hands.

- Failure to conduct cleaning and sanitizing operations for utensils and equipment in a manner that protects against contamination of food.

- Effective measures were not being taken to protect against contamination of food on the premises by pests.

### Plaintiff's Injuries

24. The plaintiff Mildred William's illness was caused by consumption of peanut butter product manufactured and sold by defendant PCA and Kellogg.

25. On or about December 27, 2008, Ms. Williams purchased Kellogg's "Austin" brand peanut butter crackers. Ms. Williams consumed the crackers on or about January 3 and 4, 2009.

26. Ms. Williams fell ill on January 5, 2009. She suffered from nausea, diarrhea, abdominal cramps, and fatigue.

27. Ms. Williams symptoms persisted and worsened for more than a week. Finally, she sought medical attention and was admitted to the hospital from January 14 through January 22, 2009.

28. While hospitalized, Ms. Williams tested positive for *Salmonella* Typhimurium.

29. As of the filing of this Complaint, Ms. Williams continues to test positive for *Salmonella* Typhimurium, and remains ill.

30. The plaintiff has incurred and will continue to incur medical expenses, has suffered and will continue to suffer pain, loss of enjoyment of life, emotional distress, and medical problems in the future as a direct and proximate result of contaminated PCA peanut butter product.

### IV. CAUSES OF ACTION

#### Strict Liability—Count I

31. The defendants PCA and Kellogg were at all times relevant hereto the manufacturer and seller of the adulterated food product that is the subject of the action.

32. The adulterated food product that defendants manufactured, distributed, and/or sold was, at the time it left the defendants PCA and Kellogg's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *Salmonella*, a deadly pathogen.

33. The adulterated food product that the defendants PCA and Kellogg manufactured, distributed, and/or sold was delivered to the plaintiff without any change in its defective condition. The adulterated food product that the defendants manufactured, distributed, and/or sold was used in the manner expected and intended, and was consumed by the plaintiff.

34. The defendants PCA and Kellogg owed a duty of care to the plaintiff to design, manufacture, and/or sell food that was not adulterated, that was fit for human consumption, that was reasonably safe in construction, and that was free of pathogenic bacteria or other substances injurious to human health. The defendants PCA and Kellogg breached this duty.

35. The defendants PCA and Kellogg owed a duty of care to the plaintiff to design, prepare, serve, and sell food that was fit for human consumption, and that was safe to the extent contemplated by a reasonable consumer. The defendants PCA and Kellogg breached this duty.

36. The plaintiff suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the defendants manufactured, distributed, and/or sold.

### Breach of Warranty—Count II

37. The defendants PCA and Kellogg are liable to the plaintiff for breaching express and implied warranties they made regarding the adulterated product that the plaintiff purchased. These express and implied warranties included the implied warranties of merchantability and/or fitness for a particular use. Specifically, the defendants PCA and Kellogg expressly warranted, through their sale of food to the public and by the statements and conduct of their employees and agents, that the food they prepared and sold was fit for human consumption and not otherwise adulterated or injurious to health.

38. The plaintiff alleges that the *Salmonella*-contaminated food that defendants PCA and Kellogg sold to the plaintiff would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

39. The plaintiff alleges that the *Salmonella*-contaminated food that the defendants PCA and Kellogg sold to the plaintiff was not fit for the uses and purposes intended, *i.e.* human

consumption, and that this product was therefore in breach of the implied warranty of fitness for its intended use.

40. As a direct and proximate cause of the defendants PCA and Kellogg's breach of warranties, as set forth above, the plaintiff sustained injuries and damages in an amount to be determined at trial.

<u>Negligence—Count III</u>

41. The defendants PCA and Kellogg owed a duty to the plaintiff to use reasonable care in their manufacture, distribution, and sale of their food product, which duty would have prevented or eliminated the risk that the defendants PCA and Kellogg's food products would become contaminated with *Salmonella* or any other dangerous pathogen. The defendants PCA and Kellogg breached this duty.

42. The defendants PCA and Kellogg had a duty to comply with all statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of their food product, but failed to do so, and were therefore negligent. The plaintiff is among the class of persons designed to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the manufacture, distribution, storage, and sale of similar food products.

43. The defendants PCA and Kellogg had a duty to properly supervise, train, and monitor their respective employees, and to ensure their compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products, but they failed to do so and were therefore negligent.

44. The defendants PCA and Kellogg had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, and regulations,

and that were clean, free from adulteration, and safe for human consumption, but they failed to do so and were therefore negligent.

45. As a direct and proximate result of the defendants PCA and Kellogg's acts of negligence, the plaintiff sustained injuries and damages in an amount to be determined at trial.

### Negligence Per Se—Count IV

46. The defendants PCA and Kellogg had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of their food product, including the requirements of the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301 *et seq*.), and the Georgia adulterated food statutes, O.C.G.A. § 26-2-1 *et. seq*.

47. The defendants PCA and Kellogg failed to comply with the provisions of the health and safety acts identified above, and, as a result, were negligent *per se* in their manufacture, distribution, and sale of food adulterated with *Salmonella*, a deadly pathogen.

48. As a direct and proximate result of conduct by the defendants PCA and Kellogg that was negligent *per se*, the plaintiff sustained injury and damages in an amount to be determined at trial.

### Punitive Damages – Count V

49. The defendant PCA's negligence and willful concealment of known defects showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

50. The plaintiff therefore prays for additional exemplary and punitive damages in an amount to be determined, to deter the defendant PCA from such wrongful conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays:

(a) That the defendants be served with a copy of this Complaint and answer as required by law;

(b) That the plaintiff be granted a judgment against the defendants on Count I-IV above for monetary damages as to all counts in an amount deemed appropriate by the Court to fully compensate the plaintiff for the damages they have suffered and will continue to suffer;

(c) That the plaintiff recover punitive and exemplary damages in an amount to be determined at trial;

(d) That the plaintiff be awarded reasonable attorneys fees and costs as a result of the undue litigiousness of the defendants resulting in the need to file this action;

(e) That the plaintiff be granted a trial by jury;

(f) That the court award the plaintiff the opportunity to amend or modify the provisions of this complaint as necessary or appropriate after additional or further discovery is completed in this matter, and after all appropriate parties have been served; and

(g) That the plaintiff be awarded such other and further relief as would be equitable and just under the circumstances.

## JURY DEMAND

The plaintiff hereby demands a jury trial.

This 9th day of February, 2009.

        FLYNN PEELER & PHILLIPS, LLC

        **/s/Patrick S. Flynn**
        Patrick S. Flynn, GA State Bar #004765
        Charles E. Peeler, GA State Bar #570399
        Flynn Peeler & Phillips, LLC
        517 W. Broad Ave.
        Post Office Box 7 (31702)
        Albany, Georgia 31701
        Tel. (229) 446-4886
        Fax (229) 446-4884

        William D. Marler, WSBA #17233
        bmarler@marlerclark.com
        MARLER CLARK, LLP PS
        701 First Avenue, Suite 6600
        Seattle, WA 98104
        Tel. (206) 346-1888
        Fax (206) 346-1898
        (pending admission *pro hac vice*)

        Attorneys for the Plaintiff